Judge Nelson, will you be able to see exhibits that are placed where there's now a large wooden easel? I don't know how well I will be able to see the exhibit, but I can see there is an exhibit, but that's about all. Well, there should have been a copy of these handed out to you. The judges should have that copy, and Judge Nelson was supposed to get it by fax this morning. I did. I have it right here. Okay. That's fine. Thank you. You may proceed. Maybe we do better just to work from the pad. From this? The handout should be a copy of these posters. This is just going to – I'm going to maybe show you more precisely where it is on these pages I'm looking. May it please the Court, Your Honors, my name is Roy Little. I represent the appellant, Hydronautics. Seated with me at council table is Mike Concanon, who has been with Hydronautics since the inception of this action and actually before, and Bill Barrett, who is the trial counsel. I would try to reserve three of my 15 minutes for rebuttal. Your Honors, there are two independent legal grounds that require reversal here, independent of the disputes about fraud and grounds that Judge Hayes did not even consider in his grant of summary judgment, and those are the arguments with regard to continuing malicious prosecution on appeal and overall scheme, antitrust liability, which this Court has held is not subject to nor Pennington immunity. But the heart of this appeal is fraud. It's about fraud and it's about facts known to Film Tech and undisclosed to Judge Thompson in 1991 that would reasonably permit a jury to infer fraudulent knowledge. Fraud by intentional misrepresentation and also fraud by act of concealment. And California law recognizes both as well as Federal law. This is fraud that only a jury can determine because the reasonable inferences that would be drawn from the facts that we know are disputed, as even dramatically different conclusions by Judge Whalen and Judge Hayes show, and they were looking at the exact same evidence. There was no evidentiary change between Judge Whalen and Judge Hayes. The fact that those reasonable jurors could reach different opinions dramatically about what knowledge is shown suggests that summary judgment is improper. Justice Kennedy, when he was on this Court, said in the Jewell case in a separate opinion, as with all states of mind, knowledge must normally be proved by circumstantial evidence. What I hope to do in my limited time here is outline the main legal errors and then briefly take you through the evidence. I know that normally appeal should not be a place where we go through the facts, but there are so many facts here. Your Honor, I brought with me a bag of bone fragments. Bone fragments. And the evidence in this case is like bone fragments, and you can't tell what this makes unless you put them together. The posters that I have, the handout that you have, those are just a tiny bit of what the bone fragments are in this case. There's only one actor in our system that's allowed to put the bone fragments together, and that is the jury, not the judge. No matter how much the district court believes that our evidence might not conclude in a finding of fraud or knowledge, it is the jury's job, so long as we can produce evidence which would reasonably suggest it. Where are all the bone fragments? Because this is only a few of them. Volumes 2 and 3, the excerpts of record, which is a very thick pretrial order. And we apologize for the thickness, but this was done because Judge Hayes, after he denied summary judgment to the parties, said, I'm going to set it for trial, and I want you to put in a pretrial order every piece of evidence you would introduce, or you can't do it. So we had to produce a pretty thick document. But you don't have to read this thick document. I would wager nobody is reading this thick document. Maybe your law clerks, I hope, will read it. But all you have to do is look at the document at the shaded areas. This is volumes 2 and 3, the excerpts of record number 26. All the shaded evidence in this volume is evidence that was discovered or produced after the 1991 trial that was never before Judge Thompson. So what I'm going to show you today, I hope, is just a little bit of that. First, let me just say that the antitrust and malicious prosecution complaints outline a campaign of fraud that began in 1977 and continued through 1994. It is a 17-year overall scheme. It was a massive anticompetitive fraud. It was designed to steal an invention that rightfully belonged to the government, conceal the invention and its lawful title from the government as well as from the competitors. That is, the claim was, this is our patent. You can't infringe it. And to unlawfully drive competitors from the industry. This motive is made very clear in 26 excerpts of record, page 206, which is, again, in the box of bone fragments, the pretrial order. At page 206, here's what Dow's lawyer wrote, and Dow Chemical owns Film Tech, in 1993 about why they should continue their campaign to not release title to the government, even as the Federal Circuit was ruling against them. Here's the quote. The value of not having membrane competition, I put the word membrane in, the value of not having competition, i.e., excluding fluid systems and hydronautics, fluid systems as allied signal, is about $7 million to $8 million increased earnings per year for Film Tech. The total is about $35 million. That is a huge pecuniary motive, and motive is relevant to determining credibility and believability. Scooter Libby was convicted yesterday because the jury rejected his defense of I forgot. And he may not, that conviction may be reversed on appeal, but it was allowed to go to the jury, and that's what should happen in this case. Let me just say briefly about the continuing malicious prosecution. In 1976, two years before the invention, or a year and a half before the invention, John Kadot signed an agreement. It's page 2 of my handout, Judge Nelson, and that agreement in paragraph 3 committed John Kadot not just to promptly disclose and to assign all discoveries and inventions that he made while he worked for the government, but also to disclose and assign all inventions and discoveries made by him within a year of leaving, within a year of leaving. I thought that wasn't terribly relevant to the case against y'all for infringement. I thought that an infringement case, the fact that the inventor may have an obligation to assign at some point in time, did not mean that they couldn't sue you for the patent they were still holding, not having made the assignment. Is that wrong? I think it's completely wrong, Judge Fernandez. And I'll tell you why, because the Federal Circuit has already resolved that issue as a legal matter in this case. The Federal Circuit in 1991 and 92 issued two opinions, allied signal and hydronautics. In the 91 opinion, they said if he has obligations to MRI, if Kadot has those obligations, then it would vitiate his right. What they said is he would have nothing to assign and therefore no title. In 1992, when they reversed Judge Thompson's infringement verdict, the Federal Circuit concluded that the fact that he had those obligations vitiated his entire attempt to have a patent and that title to the patent was a necessary preliminary step to an infringement case. So they've ruled as a matter of law. They ruled on the second contract? No, no. They ruled on the 65 contract. Is that the second one or the first one? There are three contracts. It's the second one. I'm sorry. It's the first one for John Kadot. It's the first one. Yes. Correct. But the legal issue is exactly the same. Well, it's not exactly the same. The one under which the government would get to go to them and the government would have it, is that correct? No, no, Your Honor. In 1965, John Kadot signed this contract. This contract was never disclosed. This is page 1, Judge Nelson. This contract was never disclosed to the trial court. Instead, let me just tell you what they told the trial court. They told the trial court, and this is page 10 of my handout, and I'm going to circle this in red. They said, no contract was offered to show Kadot's obligations, if any. That's 1991 they told that to John, to the judge. But it was a lie, Your Honor. It was a lie because here's the facts that transmitted that contract to film text lawyers. And it's dated January 1990. When they said in their papers no contract was offered to show Kadot's obligations, they were correct, even though they had it and they never disclosed it. But when they said, if any, and suggested there were no such obligations, that was a lie. That was a fraud. Now, the Federal Circuit did not have this contract in front of them. Neither did they have this contract. But, Judge Fernandez, the paragraphs are the same. The legal language is the same. If you look on these two pages, 1 and 2, the second paragraph of this contract is exactly the same as the third paragraph on this contract, except that this one extended for 12 months after he leaves the government. And, I'm sorry, Film Tech has always conceded that the invention was made within that 12-month period. Let me just say that when the Federal Circuit ruled in 91 and 92 and they said, if there are obligations, and Film Tech knew full well there were obligations and they didn't disclose it, they then got this contract. We think they had this contract all along. We think the inference that John Kadat signed it, that he founded Film Tech, that he conveniently forgot it, even though he remembered all his other contracts. The only one he didn't remember was the one that included the 12-month period when he invented this thing, even by their theory, he knew about it. But even if he didn't, Your Honor, the other page, page 4 is a copy of the record. It's a fact, November 92, that transmitted the 76 contract to the lawyers. Why weren't these things disclosed? Because Dow initially said they're attorney-client privilege. We didn't win that argument until 2000. But when they had this contract in November of 92, the Federal Circuit hadn't yet ruled. As soon as they saw that there was a 12-month period, they should have disclosed this to the court. That was a fraud to not disclose this to the court. That's continuing malicious prosecution under Zamos and Sucamp. Judge Fernandez, I feel that I'm not answering your question to your satisfaction. You're kind of ‑‑ I understand your point. Okay. I'm doing my best. I have four minutes left. Let me just say, that's the continuing malicious prosecution argument. The other is the overall antitrust scheme. Overall antitrust schemes that may involve one instance of petitioning activity within a long course of conduct which is not petitioning activity are not subject to Noor-Pennington immunity. That argument was made to the district court over and over, and yet in his summary judgment opinion, it's 70 pages long, he never addressed it. You can't say this case is dismissed because of Noor-Pennington immunity for the overall antitrust conspiracy, which involved lots of activity that wasn't petitioning activity. And the Ham Guards case and the Flipper Express case say, at the very least, there should have been a denial of judgment on that claim. Let me just say two points. I'll try to sit down. About the summary judgment order itself. At least 20 different times in that order, Judge Hayes used the wrong standard. He said it was hydronautics' obligation or burden to establish fraud or to establish perjury. Page 16 of my handout has one example of that. It says it's not sufficient to establish perjury. That is the wrong legal standard on summary judgment. We had no burden to establish perjury. It was our burden merely to show evidence from which a jury might draw that conclusion. And this Court has said repeatedly, and the Supreme Court has said repeatedly, even if a judge believes that conclusion would be wrong,  The other thing that he did, which is a legal error in the summary judgment opinion, at least five different times, he resolved. He recognized there were differing interpretations of evidence, and he resolved them. Page 15 is an example of that. It's the page before the one I just showed you, page 16 in my handout. This is where the pages this refers to are in my handout. This is where John Kadat in 1998, I'm sorry, 1988, before the trial, wrote out some notes where he said new membrane, and then he put the date 1977 down. We think that's an admission that he knew he invented it in 1977. Those notes were never disclosed to anybody, the Court, the government, the parties, and the inferences of fraud that you can draw from them were not drawn because they weren't before anybody until now. They need to go to the jury. But what did Judge Hayes say? He said, well, Hydronautis contends that this is perjury. And then he says, Film Tech offers a different interpretation. Well, that's correct. That's why summary judgment can't be granted because there are two interpretations to the same document. And in the SLT case, which we sent to you in a Rule 28J letter last week,  So the fact that there's a different interpretation is exactly why he couldn't grant summary judgment here. And then what did he do on the next page? He said, well, I'll grant summary judgment because it's not sufficient to establish perjury. Well, that may be true. We may get to a jury and not win. But, Your Honor, we should have that opportunity. I'm going to try to reserve the last minute for rebuttal. Thank you very much. Thank you. Good morning, Your Honors. May it please the Court. Steven Slatt in Fort Pelley, Film Tech. You know, in listening to Mr. Little, who is eloquent, as expected, and passionate, I'm reminded that we've come quite a long way in this case, but Hydronautics does not particularly move the ball very far forward in actually demonstrating that there is a triable issue of fact in this matter. Well, let me tell you where my problem is with your position, and maybe you can respond to this. Yes, Your Honor. It seems to me that one could find from the record the following, looking at it from Hydronautics' point of view. Kedat, or however it's pronounced, invented the osmosis procedure at a time after he and some of his coworkers had already begun discussing the possibility of forming their own company for profit. He didn't disclose the invention as he was required to do by his contract. He left MRI shortly after inventing this process and was one of only four co-founders of the defendant company. He recreated the invention a couple of months later, essentially the same, and patented for the benefit of the defendant. So it seems to me that a rational jury could draw the inference that he knew that patents should belong to the government at a time when he was claiming it for his new company. And I think the sticking point for me is that it's the same individual involved. I mean, it would be one thing if he were one of 1,500 employees at some big company, but he was the inventor and he was the founder of a not-for-profit company. So why couldn't a rational jury draw the inference that he basically stole this and knew full well that he didn't have any patentable right at the time the patent infringement action was brought? Your Honor, the reason why a jury cannot address those facts in the context of a trial in this case at this time is because every fact that you just identified was in the record below before Judge Thompson, and it was on that set of facts, on that very set of facts that Judge Thompson found that there was no subterfuge, and it was on that very set of facts that the Federal Circuit concluded in 1995, in connection with its dismissal of the first antitrust complaint filed in this matter, that on that set of facts, Film Tech had probable cause to bring the action. What the Court in the Federal Circuit held was that, to use the words of the Federal Circuit, the Court said that Film Tech's suit against hydronautics was objectively baseless. The issues about what Cadat invented and when were genuine. That means they were real, Your Honor. That means that they were disputed below. It means that Film Tech, not without reason, those were the words that the Federal Circuit staked a claim to owning the patent, and the Court went even further to say that Film Tech's theory was more than a sham. This Court, in its 2000 decision, endorsed that finding and held that Film Tech has an interest in the findings of the Federal Circuit that, on the basis of the facts presented in the infringement action, Film Tech had probable cause. And that is why ---- So if I understand your answer to me, let me see if I can rephrase it in a way that  Yes, Your Honor. Those are genuine issues, but they've already been resolved in your favor by prior decisions of either this Court or the Federal Circuit. Is that essentially your argument? It is, in part, Your Honor. It is not a question of collateral estoppel or res judicata, although we know that based on the Federal Circuit's findings and this Court's endorsement of those findings, we know that on the ---- in connection with all the facts and circumstances that underlie the initial infringement action, Film Tech had probable cause to pursue its patent infringement claims. Your position, as I understand it, is once Judge Thompson ruled, and in that respect wasn't overturned really, once Judge Thompson ruled, if he had the evidence we're talking about now before him, then that establishes probable cause sufficiently. Even if it turns out that a jury would find something else was true, that establishes probable cause at least. Is that your position? It is, in part. Again, it's not that that establishes probable cause. It's the Federal Circuit's conclusion in connection with the antitrust claim that there was not a sham and, therefore, there was probable cause on the basis of those facts. So that's what I'm saying, that there at least was probable cause to go forward with the action. A malicious prosecution, for example, or the antitrust sham are about was there probable cause to go forward. That is correct. And they said there was, assuming they had ---- assuming Judge Thompson had the evidence before him. Yes. If he didn't and there was a fraud in withholding it from him, that might be different. It might be, but it's not necessarily different. Let me speak to the first ---- What if Kedat was lying when he testified as he did in the action before Judge Thompson? Is the result the same, that the decision that was made on appeal of that is still good? The result is the same for two reasons. First of all, I do want to point out a procedural matter, and that is that I have scoured Hyder Nodick's opening brief. I do not think the issue of perjury is addressed. Our position is that it is waived. We did not address it in any detail in our brief in response to the opening brief because ---- No, I guess what I'm looking at is reasonable inferences that a jury could draw as to what happened at the initial trial in front of Judge Thompson. That was my question, not necessarily based on ---- Okay. Well, you ---- But it seems to me that if you took all those other inferences as possible, that a jury could decide that he was lying when he said that he didn't know that ---- that he thought that he had a basis to go forward. But the question for probable cause is whether Hyder Nodick's can establish that there was a fraud committed on the court below. That is the standard. It's not that there were additional facts. What is a ---- What is a ---- What would be sufficient in your view to establish a fraud on the court if it doesn't include omitting things and lying about things? Let me first go to the question about Kadat's testimony. Judge Thompson was very clear that John Kadat was not qualified to testify as to his invention. In fact, Judge Thompson was crystal clear that in the language that he used, but in any case, after he was describing what Kadat said or didn't say, Judge Thompson ruled that the invention was the February 1978 experiment because the November 1977 experiment, that is the subject of great controversy, did not fall within the parameters of the patent. And so what Kadat said about what he invented and when ultimately was not regarded by Judge Thompson as meaningful, and the fraud or perjury for purposes of malicious prosecution has to procure the underlying judgment. And so in this case, even if we assume that Kadat said something incorrect or that Kadat lied on the stand about that very narrow issue, which, by the way, there is no evidence. And as the record shows, John Kadat is deceased. His testimony is what it is. It is fully in the record. It has been considered in its entirety by Judge Hayes, and it is before this court, the excerpts that have been submitted. So there's not going to be any more evidence from John Kadat in this trial. And fundamentally, if hydronautics cannot prove with admissible evidence that a reasonable jury could conclude there was a fraud, a willful, intentional, knowing fraud on the court below, if that evidence is not in the record, which it is not in this case, the probable cause determination, the presumption that arises from the successful decision below a Judge Thompson stands. That presumption, see, hydronautics wants to start from the beginning without even recognizing the fact that there is a great hill to climb here. Film Tech was successful, not once, Your Honors, not once, but twice. Film Tech prevailed against Allied Signal in connection with title and the likelihood of infringement, and it was only after that that Film Tech brought its infringement claim against hydronautics. A second time after a full trial, Judge Thompson found Film Tech owned the patent, hydronautics willfully infringed. That finding, under the law, creates a clear, and to use the language of this court, conclusive presumption of probable cause. That is where we begin. That is where Film Tech begins in this matter when it is being accused of antitrust violations and malicious prosecution. We start with that presumption. Judge Hayes correctly found, and the record shows, that there is no evidence of a willful, knowing, intentional fraud. In constructive knowledge, all this discussion in the papers, and this is why Judge Whalen got it so wrong, the notion that constructive knowledge can satisfy that requirement is simply incorrect as a matter of law. Constructive knowledge of what are you referring to? I'm referring to this proposition that somehow Film Tech can be held to have constructively known that it didn't own the patent. By the way, that's an issue of law. It is not an issue of fact. So the notion that constructive knowledge is, I'm just saying generally, the notion that constructive knowledge is applicable at all to the question of whether there was an intentional knowing fraud is a disconnect. There has to have been actual knowledge in this court. Does it make any difference to the analysis that it's the same individual involved on both sides of the equation? That is, Kadat is the one who did the invention, moved over to Film Tech, and he knew whatever he had done because he did it. Well, Your Honor, the evidence, again, Judge Hayes correctly concluded that it would be inappropriate for a jury to speculate and to conjecture about what Kadat knew or didn't know on the record, because there is no evidence. In fact, the only evidence in this record. Well, I guess I don't understand what's speculative about a person knowing what they themselves have done. Why is that speculative? It is speculative when on this record every single person that has testified, every founder, every executive, every attorney, everyone connected to Film Tech that has testified in this matter has testified uniformly and categorically that no one knew about the 72-A experiment, the November 17, 1977 experiment, until it surfaced in discovery in the Allied Signal Engagement in 1989. But he knew. He was the inventor and he was also a founder of Film Tech. How could he not know what he had done? That's, I guess, my problem with your argument. Your Honor, the record shows that John Kadat tried, he was an Edisonian type of an inventor. He tried eight, ten experiments a day. John Kadat has testified numerous times and, indeed, this issue was addressed at the trial below, and that is the principal reason why it can't be reconsidered by a jury in this case. Judge Thompson heard all this evidence. Judge Thompson, in fact, hydronautics, if you look at the findings of fact and conclusions of law and hydronautics trial briefs that are submitted in Supplemental Excerpts of Record 15 through 19, you will find that this very question was presented. Did John Kadat remember and did he take the invention with him? Well, assuming he remembered that he had done that thing in his notebook, if I understand what was in front of Judge Thompson and the Federal Circuit, the question was, was the thing he did in his notebook the same as the thing he did later? That was what was litigated. He thought, no, it wasn't. Judge Thompson said, no, it wasn't. Correct. It was something different. The Federal Circuit, after applying its expertise and defining the law in the area, says, well, we think, yes, it was. So, assuming he knew, why does that show he lied when he said, I didn't invent it then? I'm just trying to you seem to be trying very hard to back away from just facing that kind of question. Am I wrong? No, you're not wrong. Is that the question or is that not the question? You're not wrong. It doesn't matter because I did speak to this. It doesn't matter because Judge Thompson found he had all the evidence. He had the 1977 experiment in front of him. He had the 1978 experiment in front of him. He heard John Kadat's testimony in the case, and he didn't regard John Kadat's which of those two membranes was the invention? What the court found was that the 1978 membrane was the invention because it and only it met within the parameters of the patent descriptions, the parameters that the patent set forth for a seawater membrane that would desalinate in the way and according to the characteristics of what the patent says. So, you're absolutely right, Your Honor. It does not matter. Let me speak very briefly because we have a little time left. Overall scheme, there is no overall scheme when the conduct in question below is the same conduct that gives rise to the petitioning activity. Here, it all goes back to a single question. Did Film Tech assert its rights to the patent ownership reasonably? We know that on the basis of all of the evidence below, it did. That same evidence is now being applied by hydronautics on a theory of overall scheme. And it's not allowed. The Hangard's case says that quite clearly. This is new wine in old bottles, and it is, excuse me, it's, we got that backwards. It's old wine in new bottles, and it is not permissible to circumvent what is required under Norr-Pennington. This Court held in 1995 and 2000 that PRE is the standard. The antitrust, for purposes of this analysis, the case has to have been objectively baseless. You cannot skirt that by claiming an overall scheme when the conduct below is essentially the same conduct that is at issue in connection with the petitioning activity. And, indeed, one of the elements of conduct, the claim that there was a misrepresentation to the patent office, that is petitioning activity itself. And, of course, we know that hydronautics has already waived its Walker process theory. It is not claiming a fraud of the patent office. So you can't bootstrap a different case by pointing to a set of facts that is essentially the same facts that support the protected petitioning activity. Counsel, you have exceeded your time, but you may wrap up very briefly. I will, Your Honor. Thank you very much. Thank you, Judge. This case, we are now before the Court on a full, complete record. It is on that record that Judge Hayes concluded two things correctly, and this Court should affirm. One, that there has not been a showing of fraud or perjury, knowing and intentional, that defeats FilmTech's conclusive presumption of probable cause. And two, that the undisputed facts on this record, notwithstanding issues relating to a couple of employment agreements, those issues are addressed in our briefs. I haven't had a chance to deal with them here, but they're fully addressed in our briefs. On the basis of that record, no reasonable jury could find that FilmTech did not have probable cause to pursue its infringement claim against hydronautics, who was infringing the patent. Thank you. Thank you. Mr. Little, we'll give you a little extra time since we allowed your opposing counsel to go over as well. Thank you, Your Honor. Judge Fernandez, let me address some of your questions. Counsel completely ignores this Court's prior ruling in 1996. There's no endorsement of the Federal Circuit's 95 opinion in this Court's precedence. In fact, in 1996, this Court said, you have to start with a clean slate because the Federal Circuit didn't have before it any dispute about fraud. It just wasn't presented. So the 96 opinion is where this Court has to start. Judge Fernandez, you also asked, well, Kadath thought it was different. I'm sorry to walk away from the microphone. Kadath thought it was different. We say that's a lie. He did not think it was different. He said that's what he thought. But here's what he wrote to his lawyers in 1988 before the action was filed. He wrote this summary, pages 7 and 8, never produced, never disclosed. What did he say? He said, new membranes. And down at the bottom he wrote 1977. On the next page he wrote FT-30, that's the invention, 1977. He was lying when he said he thought it was different because he thought that would get him out of his contractual obligation. But the most important thing that he lied about, and, Judge Craver, you are exactly right, it matters that it's him, is his 1976 employment contract, which, as a matter of law, because the Federal Circuit said the exact same language in the 65 contract meant he had nothing to give. I'm missing my boards here. Here we go. Said, I hereby promise to disclose and assign all inventions and discoveries, even if it's not an invention, made within a year of leaving. As Mr. Slutton indicated, Film Tech's theory has been February 78, he invented it when he was at Film Tech. This contract said he had to disclose that. He never did. It was fraudulently concealed from Judge Thompson, from the parties, from the competition, and from the Federal Circuit when it ruled in 1995. The last thing I think I'd like to say, unless Your Honors have questions, you would have to overrule your prior decisions in Clipper Express and Handguards in order to say that Knorr-Pennington immunity applies to an overall antitrust scheme. We allege that this scheme to block and destroy competition started in 1977 when he invented that thing at the government and continued all the way to 1994. The infringement action was not filed until 1990. From 1977 to 1990, all that anticompetitive conduct, which was lying to the government about what was invented, lying to the competition, trying to drive them out of business, that was not petitioning conduct. It's not the same activity. Thank you, Your Honors. We appreciate the arguments from both parties. They've been quite helpful and interesting. And the case just argued is submitted. We will stand in recess for an undetermined period of time.
judges: Fernandez, T.G. Nelson, Graber